**CIBA–GEIGY CORP.,**

v.

**THOMPSON MEDICAL CO., INC.**

**No. 85 Civ. 7070 (VLB).**

United States District Court,
S.D. New York.

Dec. 19, 1985.

Patterson, Belknap, Webb & Tyler, for plaintiff; Thomas C. Morrison, Dorothy Watson, Lynn Freedman, Andy Schau, New York City, of counsel.

Curtis Mallet–Prevost Colt & Mosle, for defendant; Peter Fleming, Eliot Lauer, Barbara Waitman, New York City, of counsel.

## ORAL DECISION

VINCENT L. BRODERICK, District Judge.

What follows will be my disposition at the end of a bench trial in this matter.

This action was begun on September 9, 1985. Prior to that time, an order to show cause had been filed and it was determined that we would have a fairly brief discovery period and then a trial and it was agreed that that trial constituted a plenary trial.

At the time that the summons and complaint were filed in this matter, the parties were engaged in litigation before Judge Lowe of this court in which the defendant in this case was the plaintiff and was challenging the advertising of the plaintiff in this case. That other litigation before Judge Lowe is 85 Civ. 4928.

According to the plaintiff, a study, known as Harris III, came to plaintiff's attention in the course of discovery in the case before Judge Lowe and it apparently was the surfacing of the Harris III study which occasioned the commencement of this action.

I agreed to accept this action as related to an earlier action brought by the present plaintiff in this action, CIBA–GEIGY Corp., against Thompson Medical Co., Inc. This action is a suit under the Lanham Act in which charges are also made which are predicated upon New York's General Business Law.

The plaintiff, CIBA–GEIGY, manufactures and markets, among other things, over-the-counter appetite suppressants under the trade names of ACUTRIM and ACUTRIM II.

The defendant, Thompson, markets but does not manufacture numerous appetite suppressant products. Among those products are one known as DEXATRIM–15 and another known as Extra Strength DEXATRIM.

ACUTRIM, ACUTRIM II, DEXATRIM–15 and Extra Strength DEXATRIM all contain phenylpropanolamine hydrochloride. That will be the last time during the course of this opinion that I attempt to wrestle with that word. It will be known hereafter as PPA.

PPA has been accepted by an FDA panel reviewing over-the-counter appetite suppressants as safe and effective. A tentative or a proposed monograph by this panel so characterized PPA. The Food and Drug Administration permits the marketing of PPA in over-the-counter drugs for appetite suppressant purposes so long as the maximum amount of PPA in the appetite sup-

pressant product does not exceed 75 milligrams per day.

Now, the proposed or tentative monograph that I referred to with respect to appetite suppressants was published in 1982. It did, without analysis or without any apparent analysis, accept PPA as safe and effective. But it did not, per se, address the question of the effectiveness of PPA products.

Insofar as I am aware, there has been no final action taken by either that panel or by the FDA with respect to the monograph.

I referred to an earlier action before me and in that action, in which the plaintiff here was plaintiff, CIBA–GEIGY challenged the marketing of a product of defendant Thompson called DEXATRIM–18. A preliminary injunction hearing was held in that action and after that hearing I issued an oral opinion in which I preliminarily enjoined Thompson from marketing DEXATRIM–18. The parties settled that action shortly thereafter and there was no order issued memorializing or implementing the oral opinion which I rendered except that the final settlement between the parties was filed and was so ordered by me and according to the terms of that final settlement, my oral opinion remained in full force and effect.[1]

In the present action before me, plaintiff, CIBA–GEIGY, seeks an injunction permanently prohibiting the defendant Thompson from claiming in labeling, in advertising or in promotional materials either that DEXATRIM–15 provides effective appetite suppression for 15 hours or that DEXATRIM–15 contains 75 milligrams of PPA. Plaintiff seeks, in addition to the injunction, a recall, monetary damages and attorney's fees.

Defendant Thompson has asserted three counterclaims. These three counterclaims don't lend themselves to facile capsulization. They are, in substance, as follows:

First, that the plaintiff CIBA–GEIGY misrepresented my opinion in the prior case of January 30, 1984 and that that misrepresentation took place in submissions to the various television networks in support of CIBA–GEIGY's advertising for ACUTRIM. Thompson alleges in this first counterclaim that because of such misrepresentation the networks improperly agreed to televise CIBA–GEIGY's advertisements.

The second counterclaim which the defendant asserts has to do with claims which CIBA–GEIGY makes with respect to ACUTRIM and ACUTRIM II. Defendant asserts that CIBA–GEIGY's advertising and promotional materials represent or claim that ACUTRIM and ACUTRIM II last sixteen and seventeen hours respectively and that Extra Strength DEXATRIM lasts twelve hours. Thompson asserts that these claims constitute a claim of comparative or superior duration and they are based on the false premise that 60 nanograms per milliliter of blood is the minimum level at which PPA is an effective appetite suppressant.

As part of this second counterclaim, Thompson asserts that the predicate for CIBA–GEIGY's claim is presumably various bioavailability studies and that such studies are an improper basis upon which to predicate such claims.

The third counterclaim asserted by Thompson is in substance that CIBA–GEIGY's claim of superior duration over Extra Strength DEXATRIM conveys a message of superior weight loss and thus of superior efficacy. Thompson asserts that this claim of superior efficacy is false because CIBA–GEIGY has neither conducted nor has had available to it comparative weight loss studies which would show that ACUTRIM causes dieters to lose more weight than DEXATRIM.

The defendant Thompson seeks to enjoin plaintiff from:

First, describing ACUTRIM as a 16–hour product or ACUTRIM II as a 17–hour product;

Second, making any duration claims for its products until it has available to it scientific proof that there is a minimum blood level related to effective weight loss and proof that a longer duration of that mini-

1. That oral opinion appears as Appendix I to this decision.

mum blood level leads to greater weight loss and;

Third, representing that 60 nanograms per milliliter is a minimum effective level for PPA or representing that this Court, in its prior opinion, held that 60 nanograms per milliliter is the minimum effective level for PPA.

The defendant has also asserted as an affirmative defense that CIBA–GEIGY's complaint is barred by the stipulation and agreement between the parties which ended the prior litigation.

As I have already said, a plenary trial was held on these various claims on November 11 through November 15 of this year. Subsequently, the parties made closing arguments and filed and refiled and refiled post-trial papers and what is contained now in what I have to say constitutes my findings of fact and conclusions of law.

I have already mentioned that the parties were before me previously in January of 1984 litigating the validity of Thompson's claim that DEXATRIM–18 was a 18–hour product. I do not intend to quote in any great length from the prior opinion and I am assuming familiarity with it. So far as it is applicable, I incorporate it by reference into this opinion.

I do wish to make, however, one or two observations about that opinion and its relevance to the litigation now before me. ■ Firstly, my "finding" that 60 nanograms per milliliter was the minimum effective level for PPA in the blood stream was not a scientific determination nor was it a determination that there had been a scientific determination. Indeed, I expressly stated in that opinion that I was not qualified to make such a finding. And I now quote from that prior opinion:

"The FDA has not yet found what an effective dose is or what the limitations are on an effective dose and its panel has not made such a finding. I certainly am not qualified to make such a finding. In due course, presumably that finding will be made after sufficient studies have been reviewed by the FDA, studies that will presumably relate effectiveness to intake into blood level and to bioavailability studies and bioequivalency studies.

"All of the witnesses who testified that have expertise in this area made it clear that no one of them could fix a point at which PPA was effective because the necessary clinical studies related to pharmaceutical studies have not yet been done." Transcript, 1/30/84 at 11.

My 60 nanogram per milliliter holding, to the extent that it was a holding in that prior opinion, may perhaps be characterized as a legal estoppel holding. It was applied to prohibit claims from being made that a product was effective when the blood level readings fell below 60 nanograms per milliliter. It did not, however, authorize the converse. It did not authorize a claim that a product was not effective if the blood levels fell below 60 nanograms per milliliter absent clinical proof to support such a claim.

Without citing in great detail to the prior opinion, I note that I pointed out that DEXATRIM was a product of Thompson, that Thompson had been the leader in this field of the use of PPA as an appetite suppressant and I held in substance that Thompson was bound to representations it had previously made. And those representations, in great measure, fell in the area of 60 nanograms per milliliter being a minimum blood level. When I say that Thompson was the market leader, it follows that CIBA and its products were followers in the field.

Now, applying this in this case, that opinion in the former case prohibited Thompson from advertising that its products were effective when the blood level readings fell below 60 nanograms per milliliter, at least until such time as competent scientific or clinical proof established a precise minimum therapeutic level.

That finding did not allow either Thompson or CIBA–GEIGY to claim that a competitor's product was not effective when blood level readings fell below 60 nanograms per milliliter since such claims would not be supported by competent scientific proof.

Now, one of Thompson's complaints in this case is that CIBA–GEIGY submitted my opinion in the prior litigation in support of CIBA–GEIGY's argument that DEXATRIM or Extra Strength DEXATRIM does not work when the blood level of PPA is below 60 nanograms per milliliter and it is Thompson's argument in this litigation that in making that sort of a claim, a claim of noneffectiveness below the 60 nanogram level, CIBA–GEIGY misled the television stations and ultimately misled the public as to the nature of the Thompson product.

I do not intend to expand what I have characterized as my estoppel finding in the previous case to allow such "not effective" claims, whether those claims are made explicitly or implicitly.

In this trial, as in the previous trial, none of the experts who testified, and Lord knows we had a lot of them, was able to opine as to the level, if any, at which PPA ceases to be effective. Now here I would refer to Dr. Lasagna, Dr. Williams, Dr. Meyer, and Dr. Cabana. Maybe I better even mention Dr. Silverman although I think I should say as a footnote that nothing in this opinion relies in any way on anything that Dr. Silverman said.

So we have a complete void in the way of expert opinion as to where and whether PPA ceases to be effective. It would be inequitable to allow either party to seize upon this void to make claims about its competitor's product or products without clinical evidence to support such a claim.

There was testimony in the recent trial before me directed to the question of whether 60 nanograms per milliliter was the minimum therapeutic level for appetite supression, testimony by Doctors Cabana and Meyer.

Dr. Cabana had testified as to his "therapeutic window" approach and that approach, as I understand it, is that one looks at the performance of the immediate release drugs which may be given two or three times a day depending on whether the dose is a dose of 25 or 37 and ½ milligrams and then a comparison is made between the trough immediately before another dosage and the sustained release drug.

Applying this therapeutic window approach of Dr. Cabana one finds, and Dr. Cabana found, a minimum value of close to 60 nanograms per milliliter. But both he and Dr. Meyer candidly conceded that they did not know what the minimum effective therapeutic level was.

Dr. Cabana also testified that a range of therapeutic effectiveness may be determined but in his judgment there was no rigid level below which one will move from effectiveness to ineffectiveness. And he saw no scientific validity in an approach which employed such a rigid level.

Dr. Lasagna, who is apparently conceded to be the "father of clinical pharmacology," testified that he knew of no evidence that required maintenance of moment-to-moment levels with respect to PPA in terms of sustaining its effectiveness either as an appetite suppressant or as an agent in the aid of weight loss.

In this connection I note, and I note it only in passing because it was referred to only in passing in the course of the testimony, that the Food and Drug Administration permits the use of PPA at a lesser daily amount than 75 milligrams, to wit 50 milligrams. I will not speculate beyond saying that we have no testimony at all before me with respect to where the differences between 75 milligrams per day and 50 milligrams per day come into play here.

It is perhaps arguable that the lack of any scientific opinion as to a minimum effective level of PPA would lend support to the position that Thompson took in the previous litigation in which it may be recalled it was argued by Thompson that the minimum effective level might be as low, as I believe it was, 30 nanograms per milliliter. I continue to adhere to my determination at that time that Thompson is estopped from challenging a 60 nanogram per milliliter minimum. But as I have already noted, this holding applies only with respect to affirmative advertising about the duration of one's own product. It does not apply to not-effective claims.

The precise issue presented to me in the former litigation was the validity of Thompson's claim that its product had an 18–hour duration. By contract that had been entered into between the parties prior to that litigation, Thompson was precluded from contesting the validity of plaintiff's advertisements and thus, in that litigation, I did not place the imprimatur of this court upon CIBA–GEIGY's advertising and on its product. That contract, incidentally, I believe expired or its effectiveness expired in September, 1984.

I did, in that prior litigation, accept Dr. Cabana's scientific testimony but I did not rule on the plaintiff's advertisements within the specific context of a Lanham Act challenge or a New York General Business Law challenge.

Furthermore, to the extent that the defendant Thompson sought to present the issue of CIBA–GEIGY's advertisement to me by way of affirmative defense in that original case, the parties, in effect, withdrew the issue from my determination before any final judgment was entered.

■ Coming now to the situation today or at least the situation as it was when the November trial in this action was had, the products of the parties all make implicit if not explicit claims of effectiveness for a specified period of time. I will not review all of these claims but I will, just for sampling purposes, review a few.

Extra Strength DEXATRIM claims that it curbs appetite, that it helps one eat less, that there is no stronger 12–hour capsule.

DEXATRIM–15 claims that it is the longest lasting DEXATRIM, that it gives all day appetite control, that "if you want to lose weight nothing works harder than Extra Strength DEXATRIM."

I note also that DEXATRIM–15 has a disclaimer: "The exact correlation between the level of appetite control ingredient and the level of appetite surpression [sic] has not been established in clinical studies."

ACUTRIM is claimed to be a 16–hour product, a product which delivers sixteen full hours of controlled even appetite suppressant to curb hunger and aid weight loss without caffeine.

ACUTRIM II claims, among other things, "the longest lasting appetite suppressant," "helps you eat less" and "lose weight."

With respect to both ACUTRIM and ACUTRIM II, there are claims in the way of graphs. The graph on ACUTRIM compares ACUTRIM's relatively even level to the leading caffeine-free capsule which peaks high and declines rapidly. The graph does show hours, four to sixteen, and there is no reference that the peaking refers to blood level, which it presumably does.

On ACUTRIM II, the graph compares ACUTRIM II to DEXATRIM Extra Strength. ACUTRIM II reaches seventeen hours. DEXATRIM Extra Strength reaches twelve hours. Again there is no indication on the packaging that blood level is involved.

Also in the way of claims are the television commercials of CIBA–GEIGY, the ice cream sundae commercial and the nighttime commercial, which also contained bar graphs.

The nighttime commercial contains dialogue which says that, "That twelve-hour appetite suppressant you took this morning just wore off," and it goes on to suggest that ACUTRIM lasts longer than any other appetite suppressant.

I find that the claims by the plaintiff, particularly the claims in the two commercials, are comparative claims of superiority over the products of the defendant.

Now, the plaintiff has contended throughout a paper battle which long predated this particular lawsuit, in attempting to convince the three major networks to accept advertising with respect to ACUTRIM, that the claims that it was asserting were claims only of superior duration and not claims of therapeutic advantage. And the plaintiff has continued to maintain this position through this litigation.

In a post-trial affidavit by Mr. Morrison, which strictly speaking I suspect is not an exhibit in this case, Mr. Morrison said,

"CIBA's advertising only claims superior duration; the message of clinical or therapeutic superiority is, at most, implied."

Now, I'm not dealing with that as evidence in the case. I'm dealing with it as argument in the case. But whether the claim is explicit or implicit, and in my judgment it is an explicit claim of superiority, it implicates rights under the Lanham Act.

In support of its superiority claims, the plaintiff only has blood level data and that data, at its best, is only relevant to duration. I referred earlier to the tentative monograph. I frankly do not know on what basis the panel made what apparently was an assumption of safety and efficacy. Certainly there was nothing before me in this trial or in the previous trial which constituted facts which were also facts which were before that panel when it made the finding of safety and efficacy.

Presumably it made that finding, among other things, on various presentations by Thompson and by others of past experiments but the only predicate for efficacy which I have and which, so far as I know, either plaintiff or defendant has, is that the panel has said that PPA is effective for appetite suppression and hence for weight loss.

The plaintiff before me did argue that there were some weight loss studies, its Weintraub weight loss study and weight loss studies of the defendant, and that those studies could be or should be compared and if they were compared they would establish the plaintiff's superiority or the superiority of the plaintiff's products.

I don't accept that argument or that logic. The limited evidence produced in the trial before me with respect to those studies was at best inconclusive with respect to the relative weight loss capabilities of DEXATRIM and ACUTRIM in their various manifestations and I decline to make any finding predicated upon such inconclusive evidence.

Analyzing what is before me in terms of the Lanham Act, if consumers perceive the advertising for plaintiff's products as setting forth either explicitly or implicitly the therapeutic superiority of plaintiff's products over defendant's products, then, since those advertisements do not have clinical support, they may not continue to run.

The consumer reaction surveys submitted during the trial have established that a not insubstantial amount or number of consumers take away from CIBA–GEIGY's advertisements a perception that CIBA–GEIGY has claimed that ACUTRIM, in its various manifestations, is therapeutically superior to DEXATRIM. That is, that the claims asserted are claims of more effective appetite suppression leading to weight loss.

Here I look at some of the decided cases. For instance, in *McNeilab, Inc. v. American Home Prods. Corp.*, the court noted that "a qualitative rather than a quantitative determination is enough to support a conclusion that an advertisement '*tends*' to mislead, if the qualitative showing establishes that a not insubstantial number of consumers receive a false or misleading impression from it," 501 F.Supp. 517, 528 (S.D.N.Y.1980) (emphasis in original).

I consider *American Home Prods. v. Johnson & Johnson*, significant in terms of Mr. Morrison's suggestion that CIBA's advertising only claims superior duration and that the message of clinical or therapeutic superiority is at most implied. In that case, the Second Circuit said:

> That Section 43(a) of the Lanham Act encompasses more than literal falsehoods cannot be questioned. ... Were it otherwise, clever use of innuendo, indirect intimations, and ambiguous suggestions could shield the advertisement from scrutiny precisely when protection against such sophisticated deception is most needed. It is equally well established that the truth or falsity of the advertisement usually should be tested by the reactions of the public.

577 F.2d 160, 165 (2d Cir.1978) (citations omitted).

The Second Circuit went on to say in *American Home Products* that the court's role is limited although, "it [is] in the dis-

trict court's province as trier of fact to weigh the evidence, and in particular the opinion research." 577 F.2d at 167.

■ My inquiry must be, therefore, whether the advertisements have the tendency to mislead, confuse or deceive. And in doing this I should consider the entire advertisement and here of course we're dealing principally with two television commercials and I should not engage in piece-by-piece dissection. Our Court of Appeals again dealt with this in approving the following language from the *American Brands* case:

A court may, of course, construe and parse the language of the advertisement. It may have personal reactions as to the defensibility or indefensibility of the deliberately manipulated words. It may conclude that the language is far from candid and would never pass muster under tests otherwise applied—for example, the Securities Acts' injunction that 'thou shalt disclose'; but the court's reaction is at best not determinative and at worst irrelevant. The question in such cases is—what does the person to whom the advertisement is addressed find to be the message?

*American Brands Inc. v. R.J. Reynolds,* 413 F.Supp. 1352, 1357 (S.D.N.Y.1976) *quoted in American Home Prods v. Johnson & Johnson,* 577 F.2d at 165–66.

■ In this circuit, a party challenging a competitor's advertising assumes

the burden of showing that the tests referred to by [its competitor] were not sufficiently reliable to permit one to conclude with reasonable certainty that they established the proposition for which they were cited. [I] should consider all relevant circumstances, including the state of the testing art, the existence and feasibility of superior procedures, the objectivity and skill of the persons conducting the tests, the accuracy of their reports, and the results of other pertinent tests.

*Procter & Gamble Co. v. Chesebrough-Pond's Inc.,* 747 F.2d 114, 119 (2d Cir.1984).

Now, the plaintiff has relied upon the *Procter & Gamble* case where it was said

that "each plaintiff bears the burden of showing that the challenged advertisement is false and misleading," *Id.* (citations omitted). That the defendant bears the burden of affirmatively proving falsity is a position I don't find the cases in this circuit sustaining.

In the *Coca Cola* case, the Second Circuit said, "[w]hen the challenged advertisement is implicitly rather than explicitly false, its tendency to violate the Lanham Act by misleading, confusing or deceiving, should be tested by public reaction," *Coca-Cola Co. v. Tropicana Prods., Inc.,* 690 F.2d 312, 317 (2d Cir.1982) (citations omitted).

While the plaintiff has argued that its advertisements do not assert a scientific establishment of superiority, plaintiff uses not only in its television advertisement but in its packaging a bar graph that must, in a consumer's mind, stand for the existence of some kind of scientific proof.

I should say at this point that I am not at all sure that I have to reach the question of what the consumer's attitude is. The clear message that comes from the comparison of the DEXATRIM 12–hour product to the 16–hour product or 17–hour product is that DEXATRIM is ineffective after twelve hours. That is a claim of ineffectiveness. It is a claim which must be a false claim because there is no clinical proof that DEXATRIM is ineffective after twelve hours. It is an explicit claim. It is an establishment claim. And I so find.

Having so found, I will concede the possibility that I am wrong and that it is only implicitly a claim of ineffectiveness and I will proceed to analyze public reaction.

In essence there were two types of consumer reaction surveys submitted to me for consideration in this case; one by the plaintiff, one by the defendant. Both of those surveys or types of surveys were, in my judgment, flawed.

The defendant submitted three mall intercept studies conducted by a market research firm and presented a consumer psychologist witness, Dr. Dupont.

Plaintiff submitted an ASI day after re-call test.

The defects I find in these tests are attributable to either actual defects in the studies or defects which are inherent in a random questioning of consumers. The problems with consumer surveys have been dealt with in other cases in this district and circuit. The *American Home Products* case dealt with inherent weaknesses of test data. I quote:

> Questions of reliability are raised because the two television commercial tests upon which the district court relied focused, to a considerable extent, on audience recall rather than on immediate impressions. Delayed recall measures consumer interest and advertising persuasiveness as well as message content. The Gallup and Robinson, Inc. (G & R) test was conducted approximately 24 hours after the commercial was aired by the use of telephone interviews with persons who claim to have watched the program accompanying the commercial. The ASI Market Research, Inc. (ASI) testing was performed at special screenings for a specially selected audience. The viewers were questioned about their reactions both during and one hour after the screening. Some of the people tested by both surveys either had bad memories or paid little attention to the television commercial, resulting in inaccurate descriptions, not only of the claims made but even of the products discussed. But such inaccuracies, we suppose, are to be expected in advertising research.

577 F.2d at 167 n. 15.

■ Judge Sweet has suggested that because of what he called the "quick and dirty" nature of mall intercept surveys, those surveys should receive particularly close scrutiny. *R.J. Reynolds Tobacco Co. v. Loew's Theatres, Inc.*, 511 F.Supp. 867, 876 (S.D.N.Y.1980.) In this particular case, the mall intercept studies presented by the defendants used leading questions consistently utilizing the phrase "did the commercial suggest?"

The mall intercept surveys control questions with respect to ACUTRIM, such as the doctors' recommendations questions, received an inordinate amount of "yes" answers.

Now, I have taken these problems into account in analyzing the surveys, in determining the appropriate weight they deserve, and I have discounted the significance of the high figures in the Oxtoby–Smith surveys accordingly. I don't think it's necessary or proper, however, to disregard those studies.

■ I find, after a careful review of the survey evidence, including the verbatim responses to plaintiff's day-after recall and to defendant's mall-intercept surveys to the extent that there were such responses, that a not insubstantial number of consumers were misled and deceived by the ACUTRIM commercials. I find that in the view of the consumers, those commercials claimed more than greater duration and the consumers received more than merely messages of longer duration from those commercials. The messages received by the consumers included "greater weight loss," "more active ingredients," "stronger at night," "more effective."

Dr. Dupont's analysis of these surveys is helpful and I credit that analysis but I do that only after giving consideration also to Professor Cohen's critique of the mall surveys and the documents in evidence concerning the mall surveys from Dorothy Watson and concerning the plaintiff's studies from Gerald Ostrov.

Dr. Dupont concluded that the messages that the consumers receive from the plaintiff's commercials include the following:

That twelve hours after taking a 12–hour appetite suppressant, a user of that product would become hungrier or very hungry and probably eat.

That ACUTRIM lasts four hours or more longer than any other appetite suppressant.

That this duration claim seems to be translated by consumers to one of greater overall efficacy for ACUTRIM in terms of suppressing appetite and helping one to lose weight.

Dr. Dupont concluded that the message that consumers are taking is, and I quote, "they understand the express claim of greater duration and they translate that to mean because it lasts longer it works better and probably will help me lose more weight. And it's not terribly surprising".

Now, after considering all of the above, I conclude that plaintiff's commercials make therapeutic claims in addition to the claim of superior duration, claims with respect to which plaintiff does not have clinical support. I further conclude that a not insubstantial number of consumers perceive the commercial in that way.

Since plaintiff is claiming implicitly or explicitly that its products are therapeutically superior, such claims must be supported by well controlled clinical studies. And here I quote from 21 C.F.R. § 320.28 (1987):

"Correlation of in vivo bioavailability data with an acute pharmacological effect or clinical evidence of safety and effectiveness may be required if needed to establish the clinical significance of a special claim, e.g., in the case of a controlled release preparation."

Now that particular regulation was written by Dr. Cabana. In the course of the trial before me he downplayed its significance, stating that the FDA rarely invoked its use.

It is clear to me, however, that bioavailability studies, whatever their nature, do not constitute surrogates for well-controlled clinical studies. Such bioavailability studies are directed to the rate and extent of absorption. They can be related to therapeutic effectiveness only when there are clinical studies with respect to products establishing the therapeutic effectiveness of those products, at which point other products can be shown to be bioequivalent to those products.

■ I now address myself to DEXATRIM–15. It became clear during the trial that DEXATRIM–15 is not performing as the defendant wishes it were. It is not performing as a 15–hour product under the estoppel of the previous case. This was effectively conceded by counsel in its post-trial submissions and is established by the Hazelton bioavailability study. And this fifteen hour failure is also confirmed by the study conducted by Dr. Williams on DEXATRIM–15 during July and August of 1985 and by the defendant's own Harris III study.

The Williams study and the Harris III study both suffer from problems in design or execution. I still deem them relevant in conjunction with all the other evidence on this question. In consideration of their defects I have discounted the weight which I accord to them.

I therefore enjoin Thompson from marketing the product DEXATRIM–15 until it has conducted appropriate, well-controlled tests to support a 15–hour duration claim consistent with the principles which were laid down in my opinion in the earlier trial.

Now, in light of this ruling, I find it unnecessary to rule upon plaintiff's contention that DEXATRIM–15 or that DEXATRIM is not a 75 milligram product.

The defendant has undertaken internal steps to insure the bioequivalence of its product. Defendant's counsel has informed me, by letter dated November 22 of this year, "because of CIBA's allegations with respect to the potency of the product, Thompson undertook in mid-October to quarantine and withdraw from distribution all the DEXATRIM–15 product manufactured prior to this year."

As part of my injunction with respect to DEXATRIM–15 I direct that the voluntary quarantine which counsel has informed me of with respect to that product will remain in effect until further order of the court.

Now, the defendant's first counterclaim is with respect to whether the plaintiff misrepresented my January 30, 1984 opinion as to DEXATRIM–15. In particular the defendant asserts that the plaintiff's communications with the networks with respect to the running of the commercials carried the following explicit claim:

"ACUTRIM efficacy support was confirmed in Judge Broderick's decision of January 30th, 1984 in CIBA–GEIGY versus

Thompson Medical Co., 83 Civ. 8924 (VLB). Judge Broderick further established 60 nanograms per milliliter as the minimum efficacy level for the category based upon scientific and market data."

Now, that paragraph, in and of itself, could perhaps be characterized as false and misleading. However, the plaintiff at the time that letter was written, to Ally & Gargano, an advertising agency, had already forwarded to the networks a copy of the opinion and included in the same letter sentences which qualified that word "established."

Again I quote:

"CIBA provided support for its currently running ACUTRIM commercials to NBC in a submission dated February 15, 1983. This submission supported ACUTRIM efficacy based upon: 1) blood level results compared with FDA monograph dosing regimens and 2) competitive product duration claims dating back to 1979."

On January 21, the plaintiff communicated again with NBC that had received the original letter dated October 15 and said the following:

"The matter of duration was the focus of our Lanham Act suit"—I'll leave out the citation. "Judge Broderick's guidelines for determining duration claims were based in large part upon minimum blood levels of 60 nanograms per milliliter as established by bioavailability studies and confirmed by documents in Thompson's own files including packaging and advertising for DEXATRIM Extra Strength and network submissions suporting [sic] 12 hours advertising for the DEXATRIM Extra Strength product."

Certainly plaintiff could have used a better choice of words in characterizing my 60-nanogram-per-milliliter determination but in the overall scheme of things, plaintiff's statements were not false or misleading.

Now, defendant also seeks to enjoin plaintiff's comparative advertising on all packages and in all advertisements. I have discussed and to a certain extent analyzed this advertising already.

Plaintiff's claim of four hours' longer duration is an explicit assertion that its product is therapeutically superior to defendant's product; that is that longer appetite suppression leads to greater weight loss. Now, if my finding that that is an explicit assertion is wrong, it is certainly an implicit assertion to the same effect.

The plaintiff argues that its comparative claims are solely durational claims and that the FDA does not regard a claim of superior duration as constituting a claim of superior efficacy. I find otherwise. I find it inconceivable that this advertising makes any sense or would have any impact if it did not convey the message of superior efficacy.

I note that Dr. Halperin testified or at least conceded that a claim of longer duration of appetite suppression implicitly constitutes a claim of greater weight loss.

I don't mean anything that I have said thus far to be a technical criticism of CIBA–GEIGY's advertisements. They are good advertisements and they are very humorous advertisements. But they are advertisements that the consumer understands to say that the plaintiff's product lasts longer and is more effective in maintaining appetite suppression and in achieving weight loss.

I've already noted the problems I have with the consumer surveys but considering those surveys in conjunction with Professor Cohen's critique and my own perception of the commercials, I conclude that the advertisements make therapeutic superiority claims without the necessary clinical support.

It is at least unofficial FDA doctrine that "any labeling claim of clinical advantage such as greater effectiveness. and/or reduced incident of side effects, must be substantiated by appropriate well-controlled clinical studies" FDA Guidelines by Commissioner Skelly, Defendant's Exhibit C.

Plaintiff has no clinical evidence to support its claim of superior therapeutic advantage over DEXATRIM and thus plaintiff's comparative advertisements are false

and deceptive pursuant to the Federal Trade Commission Act and New York law.

As I noted earlier, plaintiff may not seize upon my having enjoined defendant from claiming its product is effective when its blood level drops below 60 nanograms per milliliter as the basis for claiming that defendant's product is not effective when it drops below that level. Plaintiff has no scientific or clinical evidence to support such a claim and it is false and deceptive to the consumer to make such a representation.

Thompson also seeks to enjoin CIBA–GEIGY from claiming that its products, ACUTRIM and ACUTRIM II, are 16– and 17–hour products respectively. Defendant has introduced nothing to persuade me to change my opinion as stated on January 30, 1984 in which I adopted Dr. Cabana's determination:

"that the bioavailability study which had been conducted at plaintiff's instance, [ALZA] and which was the predicate for plaintiff's graph was a scientifically appropriate study and that it in fact supported fully the claims which were contained in plaintiff's graph." Transcript, 1/30/84, at 6.

Dr. Cabana reiterated in this trial his conclusion that the two studies supported CIBA's claims that CIBA's product was a 16–hour product. Thus with respect to ACUTRIM 16 I decline to enjoin plaintiff from advertising that its product has 16–hour duration. I find, however, that plaintiff may not claim that ACUTRIM II has a duration of 17 hours.

Dr. Williams, himself a witness for the plaintiff, conceded that the data generated from the study he conducted on ACUTRIM II does not provide a basis for advertising that ACUTRIM II is a 17–hour product. Although he testified on direct examination that the raw data showed greater than seventeen hours above 60 nanograms per milliliter, he candidly admitted on cross-examination that his data did not support such a claim.

Dr. Leeson testified that he does not know whether ACUTRIM II suppresses appetite for any longer than ACUTRIM.

Plaintiff is therefore enjoined from the continued marketing of ACUTRIM II as a 17–hour product until it has conducted appropriate tests to justify such a claim.

I think the next thing that I have to say is dictum. I have resisted an inclination to enjoin the continued marketing of either of these products until appropriate clinical tests have been conducted. We are in an area here where each one of the parties has a tremendous financial investment and there was testimony as to the millions that were involved in advertising.

I recognize, from the testimony of various of the witnesses offered by both sides, how difficult it would be to prepare, to plan an appropriate clinical study in this area. And I also recognize the dangers involved in financing a clinical study which may turn out to be not very helpful but will always be available in the next lawsuit.

At the same time, there is a public out there that is entitled to something more than attractive, entertaining and humorous advertisements. I say this is dictum because I have been persuaded by my law clerk that there are limits on the power of a federal judge and that I cannot reach beyond the case in controversy.

The ultimate relief that the defendant has sought on its counterclaims is a bit disingenuous. It has sought to enjoin plaintiff from making 16– or 17–hour claims but seeks to continue to market its product as a 15–hour product. The relief that I am ordering is very specific. The defendant may not market DEXATRIM–15 as a 15–hour product. Plaintiff may not market ACUTRIM II as a 17–hour product and plaintiff may not make comparative superiority claims without clinical proof of therapeutic advantage.

I am not restraining either party from making durational claims if those durational claims are adequately supported. But they must be explicitly delineated as blood level durational claims and nothing more. Without clinical proof of what these blood levels mean and thus what effect, if any, these products have on appetite suppression and hence on weight loss, it would be

false and deceptive to claim that a certain result would obtain when one has no support whatsoever for that claim.

## APPENDIX I

### Oral Decision

### No. 83 Civ. 8924 (VLB)

### January 30, 1984

VINCENT L. BRODERICK, District Judge.

Plaintiff has applied for an order preliminarily to enjoin the defendant from doing the following:

A. Claiming in any packaging, labeling, advertising or promotional materials that Dexatrim provides 18 hour appetite control.

B. From utilizing in any Dexatrim packaging, labeling, advertising or promotional materials the graph which is contained on the Dexatrim package.

C. From making the claims contained in paragraph 16 of the complaint, which include the following: 18–hour appetite control; Dexatrim 18–hour continuous action capsule; works all day; curbs your appetite from early morning until bed time; new time release technology curbs your appetite from early morning until bed time; Dexatrim's new 18–hour continuous release appetite suppressant works from early morning until bed time.

Plaintiff's application is predicated on both the Lanham Act and the New York General Obligations law. The standards for preliminary relief are well established in this circuit. The plaintiff must establish probable irreparable harm and probability of success or it must establish that there are serious litigatable issues between the parties; that the balance of hardship tilts decidedly toward the plaintiff and that the plaintiff will suffer probable irreparable harm if relief is not granted.

Both plaintiff and defendant are engaged in the sale of over-the-counter appetite suppressants. The plaintiff is a large manufacturer of drugs and has only recently come into the field of marketing Acutrim, which is its appetite suppressant. It both manufactures and sells this product.

The defendant markets and sells drug products, principally appetite suppressants, but it does not manufacture them.

The defendant is the market leader in the field of appetite suppressants. It markets four of the leading brands and it commands some 80 percent of the market for these over-the-counter drugs.

Plaintiff, as noted, is a relatively new participant in this field and first entered the market on a test basis in February 1983.

The technology of the drugs marketed by the two parties differs. The defendant's technology is the use of a pill with beads that are released. Its products are controlled release products and these beads are designed to release PPA, the drug involved, over a period of time. Some of the defendant's products also contain other items: caffeine and vitamins.

The plaintiff's product consists of a permeable or semipermeable pill which has within it a core of PPA and which is coated on the outside with additional PPA. The PPA on the outside is intended for immediate release, the PPA in the core of the pill is gradually forced from the pill over time by the osmotic effect of liquids within the body that gradually force the PPA within the pill out through a hole which has been drilled by a laser beam.

Prior to marketing its drug or its product, Acutrim, the plaintiff commissioned studies in which that product, Acutrim, was compared to Dexatrim 12, which was one of defendant's products, and also to an immediate release solution of PPA.

Predicated upon the results of these tests, plaintiff first moved to test market and then to the marketing of its new product. It was immediately successful in the test market area. It was marketing its product on the basis of a continuous action over 16 hours and a precise release formula.

Defendant challenged various of plaintiff's advertising claims. The challenge ran directly to the plaintiff and it was also

registered with the Better Business Bureau and with one or more television stations with respect to some of plaintiff's television advertising.

Plaintiff and defendant carried on some negotiation with respect to the challenge by defendant and then agreed to submit plaintiff's graph of the comparative release patterns of Acutrim on the one hand and Dexatrim 12 on the other hand to one Dr. Cabana, who was selected by both of them to arbitrate the question of whether the graph used by the plaintiff in its sales literature and on its packaging was justified or not. The parties agreed, in substance, that if the graph was not supported by a valid scientific study, the graph would be withdrawn. They also agreed that if the arbitrator, Dr. Cabana, found that the graph was supported, then the defendant would withdraw its complaints.

I will note that prior to the time that the matter was submitted to Dr. Cabana, the plaintiff did make various modifications in the graph that it used on its package and for sales purposes and made other textual changes in its advertising as a result of the conferences which it held with defendant.

I would note that the plaintiff's graph, which was the principal thrust of defendant's complaints to plaintiff itself, to the Better Business Bureau and to the television stations, was a comparative graph and purported to compare the blood level over time achieved by the use of Acutrim, plaintiff's product, as compared to that of the leading product, which was not named as such, Dexatrim 12.

Dr. Cabana found that the bioavailability study which had been conducted at plaintiff's instance and which was the predicate for plaintiff's graph was a scientifically appropriate study and that it in fact supported fully the claims which were contained in plaintiff's graph.

Dr. Cabana reported these findings or these conclusions and the reasons for the conclusions to both plaintiff and defendant and defendant at that point withdrew its complaints.

The negotiations with respect to plaintiff's advertising took place in the fall of 1983. Sometime prior to that, however, defendant had geared up to meet the competition by developing and planning to market a sustained release drug of 16 hours.

The evidence before me does not suggest that prior to the time that plaintiff marketed its product, with its graph of time against blood level, that defendant had ever used such a graph, but defendant developed a graph which in appearance was very similar to that which was used by the plaintiff. This graph was developed before any scientific research was done to determine whether in fact defendant could develop an effective controlled release drug of sixteen hours or of eighteen hours and the packages for the 16- and 18-hour product were in fact developed before any results of any scientific research were at hand.

During the summer of 1983 defendant commissioned a study to be made of its proposed product, whether sixteen or eighteen hours, upon six persons. The results of that study were then analyzed by two different research facilities. In due course defendant commenced to market and to advertise Dexatrim 18, a product which it claimed was an 18-hour product. Plaintiff challenged the scientific predicate for an 18-hour product and suggested to defendant that this matter also be submitted for impartial review. Defendant declined and this action ensued.

It has been brought to my attention in the course of the presentation of evidence in this action that the defendant has always been very quick to meet competition. Various other companies have sought to produce sustained release products which would be competitive with the defendant and the defendant has met this competition by increasing its own commitment to advertising and at the present time there is no single company, other than defendant, that has any substantial share of the market.

Whether or not defendant is technically a monopolist in this area, it is certainly entitled to meet competition. It is entitled to meet that competition through more aggressive selling, through advertising, through the development and the imple-

mentation of new and different marketing techniques. It is not, of course, permissible for it to meet competition by false advertising.

The evidence indicates that defendant plans to meet the threat posed by the plaintiff's product through a massive advertising program for its new product, Dexatrim 18. The projection is that some $20 million will be spent on the promotion of this product during this year.

It is plaintiff's position that while defendant can freely compete, it cannot do so through advertising that is false, and plaintiff claims that defendant's claims with respect to Dexatrim 18 are false claims.

Plaintiff claims that the graph which is used by the defendant is a false statement in that it shows blood levels which cannot be scientifically supported. It claims that Dexatrim 18 does not control appetite for 18 hours; that it is not a continuous action capsule and that it does not work all day.

The evidence that was submitted in the course of the hearing on this application for a preliminary injunction ran through a considerable part of the history of controlled release appetite suppressants. That history is in large part a history of the defendant itself because the defendant is now and has been for some considerable period of time the major force in this industry.

The trial became, to a considerable extent, a battle of experts as to the validity or invalidity of the scientific backup for Dexatrim 18, as to the significance or lack of significance of bioavailability and bioequivalency in this context and as to what is known and unknown, established and not established in the drug appetite suppressant field.

There is apparently little guidance at this time from the Food and Drug Administration. In 1979, the Food and Drug Administration appointed a group to study the area of the safety and effectiveness of various appetite suppressants, and in 1982 that group issued a report which has been published by the Food and Drug Administration in the Federal Register in the form of a tentative monograph.

The monograph does not move us very far ahead. It has been published for comment. When comment has been received by the FDA, there will be a tentative final monograph, and in due course there will be definitive FDA guidance in this field. There is no such guidance today.

In the introduction to the monograph, the tentative monograph in the Federal Register, the statement is made that "At this time the agency has not evaluated the panel's findings regarding the effectiveness of weight control drug products." Weight Control Drug Products for Over-the-Counter Human Use, 47 Fed.Reg. 8,466 (1982).

The panel in the monograph did not address itself to the question of effectiveness. It assumed effectiveness. "The panel concludes that phenylpropolamine hydrochloride is generally recognized as safe and effective when used for O–T–C weight control in the dosage noted below." *Id.*

It did review various studies that had been made and it said it believed that the combined evidence of those studies establish the effectiveness of PPA.

"The panel has determined that a single dose of phenylpropolamine hydrochloride of 25 to 50 mg, and a daily dose of not more than 150 mg, given in divided doses 30 minutes before meals is generally recognized as safe and effective for weight control. In addition, for any timed release preparation, the per dose and daily dosage must not exceed those for the non-time release preparation." *Id.*

The FDA itself was not satisfied with those boundaries and in its introduction it made it clear that it was going to require a limitation of a maximum daily dose level of 25 to 37.5 milligrams to a total of 75 milligrams and a timed release dose of 75 milligrams. That is substantially all the guidance that can be had from the FDA itself, except that the FDA is permitting the sale of these over-the-counter suppressants.

The FDA has not yet found what an effective dose is or what the limitations are on an effective dose and its panel has not made such a finding. I certainly am not

qualified to make such a finding. In due course, presumably that finding will be made after sufficient studies have been reviewed by the FDA, studies that will presumably relate effectiveness to intake into blood level and to bioavailability studies and bioequivalency studies.

All of the witnesses who testified that have expertise in this area made it clear that no one of them could fix a point at which PPA was effective because the necessary clinical studies related to pharmaceutical studies has not yet been done.

The question that is really presented to me in this case is whether this vacuum in informed scientific and clinical information opens Pandora's Box: can a drug company claim that its product is effective for eighteen hours or twenty hours or twenty-four hours because a precise study has not yet been made with respect to effectiveness and because the FDA has not yet had its final word on the subject.

Let me just say something about the tests that have been before me, and I am going to compare now the Alza tests on the one hand to the Thompson tests on the other hand. I have already adverted to Dr. Cabana's evaluation of the Alza tests, and I note that he was evaluating them from the perspective of an experienced scientist with drug company background and with FDA background, who had been chosen for his expertise by both the plaintiff and defendant. He found, and I accept the finding, that the Alza tests were not only sound scientific tests which conform to rigid FDA requirements for bioavailability tests, but he found that they provided a proper predicate for the graph claims made by the plaintiff.

Dr. Cabana also evaluated the tests upon which defendant relied and he found that they were, in substance, not valid for any purpose. They were not bioavailability tests, they did not have proper controls and they would not have been accepted by the FDA if submitted to the FDA. The thrust of his testimony was that I as the fact finder here should not accept those tests either.

Dr. Cabana, at the time he was testifying about those tests, was in a somewhat different posture than he was in at the time that he opined on the Alza tests. At this stage he was an expert who had been called by the plaintiff. His testimony was, however, supported by Dr. Meyer and I am satisfied that his evaluation of the worth and the value of the Thompson tests was accurate.

In the course of the hearing before me, various witnesses were asked to accept the hypothesis that the minimum therapeutic level for PPA was 60 nanograms per milliliter. No witness testified that that was the effective therapeutic level.

It was brought out on cross-examination of Dr. Meyer that at least one person recognized as an expert suggests that there are wide therapeutic ranges for over-the-counter drugs. Whether or not 60 nanograms is a minimum therapeutic level or not, however, there has been extended concentration on that figure through the relatively short history of PPA as an appetite suppressant, at least to the extent that that history has been brought to my attention through the efforts of counsel.

We do know that with respect to various drugs, there is a correlation between blood level and the ranges of effective or permissible therapy. Some drugs have had established for them minimum and maximum blood level ranges below which it is known that the drug will not be effective and above which it is known that there will be or there may be toxic effects or some undesirable side effects. With respect to those drugs, blood level informs us both as to safety and as to effectiveness. The blood level at best is a surrogate. The testimony in the course of the hearing establishes that all drugs operate on various end points and the consensus seems to be that PPA has its effect on the central nervous system.

As I have reviewed the history of consideration of this matter of effective blood level, insofar as that history has been brought to my attention, it becomes fairly clear that 60 nanograms per milliliter was

accepted as at least a theoretical or hypothesized minimum effective level.

The genesis of this emphasis on 60 nanograms is undoubtedly directly related to the method by which a time release drug is tested. A time release drug is traditionally tested against an immediate release drug in solution and its effectiveness is measured by its relationship to that immediate release drug.

In many of the bioavailability studies that were put in evidence before me this was done, and the immediate release control drug, whether a 4–hour drug with 25 milligrams or a 35 or 37½ milligram drug which was a 6–hour drug, the control release product was measured against that, and if it were a proposed 12–hour product, it would be measured against three 25 milligram immediate release drugs given four hours apart. The 60 nanograms runs throughout the record of this case as being the low end of those immediate release drugs at the end of the prescribed period of four hours or six hours or eight hours or twelve hours.

I mentioned earlier that the development of PPA as an appetite suppressant is pretty largely the history of Thompson itself and it is Thompson and the scientists engaged by Thompson and working with Thompson who have provided a great deal of this background.

Thus, in a memorandum from H.I. Silverman to various officials of Thompson dated May 17, 1977, he discussed the clinical effectiveness for a PPA time release capsule in terms of a 6– to 8–hour clinical effectiveness. The plasma level at the sixth hour was 71.

In 1979, on February 16, which I believe was about the time that the FDA was commissioning its panel to conduct its study, Dr. Silverman, who is, according to the testimony before me, the head of Pfeifer Laboratories, submitted to Dr. Steinberg of Thompson information with respect to Dexatrim and Prolamine, stating that both products provide for not less than eight and up to twelve hours of therapeutic effectiveness as the data illustrates.

In that memorandum, Dr. Silverman assumed that the effective level of the drug would fall between 80 and 120 nanograms per milliliter and states that any value between those figures should induce therapeutic effect.

On April 5, 1979, Dr. Silverman sent various charts and figures to the offices of Thompson which were apparently related to the various charts and graphs contained in Exhibit 66. These are contained in Exhibit 68 in which he states: "To help in interpretation, the blood (plasma) levels achievable by taking either Prolamine or Dexatrim have been plotted together with levels developed following TID dosing with the MSD product Propadrine. Propadrine (25 mg PPA) is generally used as the standard of comparison for phenylpropolamine bioavailability studies."

On March 28, 1979, Dr. Steinberg of Thompson sent a letter to the Compton Agency which, we learned in the course of the hearing, was the agency which represented Dexatrim in some of its advertising, including its television advertising.

In that letter, he states that he encloses a bioavailability curve to support the claim that Dexatrim helps curb appetite for up to twelve hours. He also states that at the final meeting of the Miscellaneous Internal Review Panel of the FDA, which took place on March 2, 1979, "The Review Panel voted unanimously that our phenylpropolamine caffeine combination is safe and effective as an appetite control stimulant product."

The enclosed bioavailability curve shows Dexatrim at the end of twelve hours not at a level above 60, but at 50.

There is a letter, however, very shortly after that, July 17, 1979, from NBC to Compton, in which it states "Regarding Dexatrim's efficacy over a 12 hour period, Dr. Steinberg will send us the medical reference which indicates that the 60 ng per ml level in the blood is effective." This letter by its terms followed a meeting the previous day with Dr. Steinberg of Thompson.

On September 22, 1981, Mr. Abraham, the chairman of Thompson, wrote to the Food and Drug Administration. He states

in the letter that he is taking the opportunity to enclose the following information "that we think will be of help in assuring you that the current state of the art in manufacturing 75 mg time release capsules for appetite suppression is indeed reliable."

The first thing enclosed is a bioequivalence study of a 75 milligram sustained release PPA capsule compared to one 25 mg dose of an immediate release product every four hours.

The letter goes on to say, "The bioequivalence test, which employed 18 healthy adult volunteers, demonstrated no significant difference at the 95 percent confidence level between the area under the curve of the 75 mg time release product and the area under the curve of the 25 mg dose administered every four hours utilizing analysis of variance. It was concluded, therefore, that a single dose of 75 mg dose of phenylpropolamine is equivalent with respect to bioavailability to a single 25 mg dose of phenylpropolamine given every four hours for a total of three doses."

The study enclosed showed blood levels over time following a single dose of Control and three doses of Propadrine, Control being a Thompson product, and the levels at twelve hours and at fifteen hours. The level at twelve hours was well over 60. The level at sixteen hours was close to 60.

The report that was included with this letter, the bioequivalence study, stated "The bioequivalence test performed found no significant difference at the 95 percent confidence level between the AUC for Control R and the AUC for Propadrine R utilizing analysis of variance. Further, in all subjects bioavailability was better than or equal to .75 of the referenced product after Control administration. It can be concluded that a single dose of Control is equivalent, with respect to bioavailability, to three 25 mg doses of Propadrine given every four hours.

"The serum level time curve also shows that administration of Control can maintain serum levels of PPA above 60 ng/ml, the hypothesized anorectic concentration, from approximately 1.75 until 16 hours after administration. It is apparent that there is

little fluctuation in serum PPA levels over this period. It can be concluded that Control can maintain anorectically effective serum PPA levels for at least 12 hours."

The Mason and Amick study, which was made in 1980 and published in 1981, shows that at the four hour mark, with respect to a single 25 milligram dose of PPA hydrochloride, the ng/ml level was above 50.

I also referred to the study of Pfeifer Laboratories, which is dated in 1981, which dealt with tests of both Extra Strength Dexatrim and Control. These were bioequivalency studies.

With respect to Control,

The bioequivalence test performed found no significant difference at the 95 percent confidence level between the AUC for Control and the AUC for Propadrine utilizing analysis of variance. Further, in all subjects bioavailability was better than or equal to .75 of the referenced product after Control administration. It can be concluded that a single dose of Control is equivalent with respect to bioavailability to three 25 milligram doses of Propadrine given every four hours. The serum level time curve also shows that administration of Control can maintain serum levels of PPA above 60 ng/ml, the hypothesized anorectic concentration, from approximately 1.75 until 16 hours after administration. It is apparent that there is little fluctuation in serum PPA levels over this period. It can be concluded that Control can maintain anorectically effective serum PPA levels for at least 12 hours.

Then with respect to Extra Strength Dexatrim,

The bioequivalence test performed found no significant difference at the 95 percent confidence level between the AUC for Extra Strength Dexatrim and the AUC for Propadrine utilizing analysis of variance. Further, in 94 percent of the subjects, bioavailability was greater than .75 relative to Propadrine after administration of Extra Strength Dexatrim. It can be concluded that a single dose of Extra Strength Dexatrim is bioequiva-

lent to three 25 milligram doses of Propadrine administered every four hours. The serum level time curve also displays that the administration of Extra Strength Dexatrim can maintain serum PPA levels of 60 ng/ml or greater from approximately 1.75 until 14 hours after administration. There is little fluctuation over this period and it can be concluded that Extra Strength Dexatrim can maintain anorectically effective blood levels for at least 12 hours.

As late as June 13, 1983, and this was at a time when Thompson was very much aware of the development of Acutrim, D.M. Graham Laboratories wrote to Thompson on June 13.

Enclosed is the information you requested regarding our 12 hour phenylpropanolamine hydrochloride for which an NDA was filed over a year and a half ago. FDA is interested in invitro data only as a means of controlling manufacturing. Only invivo data is acceptable to FDA and our invivo clearly shows a 15 hour efficacy, since FDA considers a phenylpropolamine dose of 37.5 mg every six hours to produce therapeutically effective blood levels of phenylpropanolamine. As you can see from the accompanying blood level graph, if the lowest blood level of the immediate release phenylpropanolamine is taken as an effective level as FDA accepts, then our timed release phenylpropolamine maintains an effective blood level for at least 15 hours.

The attached chart seems to show at fifteen hours a blood level of 50 and not 60.

Finally, I refer to the charts which are the Alza studies which show the Dexatrim blood level at twelve hours. Those were studies of the Dexatrim 12 hour product and they show blood levels above 60.

I find from the review of these documents that it was generally accepted in the appetite suppressant over-the-counter drug field that the test for a minimum therapeutic level, absent clinical tests to indicate otherwise, was the blood level for an immediate release product at the end of four hours with respect to a 25 milligram PPA product and at the end of six hours with respect to a 37½ milligram product.

I find further that this was not only known to Thompson, but that Thompson, as the prime mover in the over-the-counter drug appetite suppressant field, was a part of the development of those standards. They were standards that anyone coming into this field, such as the plaintiff here, would be required to conform to.

I am supported in this finding by the conclusion that if it were otherwise, products that Thompson has been marketing for years could have been marketed for time periods in excess of those that they were marketed for. For example, a 12–hour product could have been marketed as a 16–hour product or perhaps even an 18–hour product. Thompson did not do this because it realized that even without clinical tests that established minimum therapeutic blood levels, those minima were built into the structure of the system and the minima were provided by the cycle of the immediate release drugs which were used as tests.

The development of Dexatrim 18 as an 18–hour product was a fascinating tale. Dr. Waggoner suggests that the minimum therapeutic level is 20 to 30 and he reaches that by putting together a 1981 study of Dr. Silverman with a clinical study by Dr. Hoebel.

He further hypothesizes that there is a residual therapeutic effect which is produced by the brain even after blood level drops down. I am not disposed to spend too much time in analyzing the machinations which Thompson went through to justify its claim of 18 hours of effectiveness. I find simply that there is nothing in the record before me that justifies that claim.

The defendant has argued that the burden is the plaintiff's burden to prove the falsity of the claim. I find when that claim is compared to other claims that Thompson has made throughout this period before there was a competing 16–hour product in the market, Thompson proves its falsity itself. Thompson's minimum levels until 1983 have always been 60, with the exception of a hypothesized 50 that seems to

have gone up to 60 again in the course of negotiations between Thompson and the television stations.

At any rate, whatever the effective level, the effective therapeutic level, in due course that actual level will undoubtedly be determined by the FDA after practitioners in this field such as Ciba and Thompson have furnished the FDA with the adequate quantum and quality of biopharmaceutical and clinical studies.

I find on what is available today and what was available to Thompson at the time it made its 18–hour claim, that that claim was false.

I find further that if Thompson is not enjoined from continuing to assert that claim and continuing to market a product under the umbrella of that claim, the plaintiff will be irreparably injured. That irreparable injury will consist in loss of sales which cannot be quantified.

I want to refer again to the graph which has been developed by the defendant. That graph is in appearance remarkably similar to the graph of the plaintiff except that it does not purport to show comparative data. I have already noted that defendant never, so far as the evidence here shows, previously used a graph.

There was a great deal of testimony as to the meaning and significance of that graph. It was argued that it was not a blood level graph, that it was a graph indicating the effective level of appetite suppression or the continuity of appetite suppression. It was clearly a blood level graph. It was clearly intended to be a blood level graph and it was clearly intended to be seen in juxtaposition to the graph of the plaintiff.

The testimony in the hearing indicated that certainly in drug stores, appetite suppressant drugs are displayed generally next to one another, in close proximity to one another, and the reason and probably the only reason for developing that graph was to neutralize the sales effect which defendant, through its market research, had learned that the plaintiff's graph had already had.

There is every probability that the plaintiff will succeed on the merits in this case. I grant its application.